[No. 7246. Decided June 12, 1908.]

ANDERSON SUELL, *Respondent*, v. CHARLES H. JONES, *Appellant.*[1]

STATUTES — IMPLIED REPEAL — MUNICIPAL CORPORATIONS — ORDINANCES—LAW OF ROAD. An ordinance requiring vehicles going south to keep on the westerly side of the center of a street, and going north, on the easterly side, is not impliedly repealed by an ordinance to regulate the use and speed of automobiles which required that they keep to the right on meeting vehicles, and contained no repealing clause; since there is no express conflict and implied repeals are not favored.

DAMAGES—PERSONAL INJURIES—EVIDENCE — MORTALITY TABLES— AGE—ADMISSIBILITY. In an action for permanent injuries, mortality tables for the years between 54 and 60, to show plaintiff's life expectancy, are admissible, although he is a negro and his age was not shown, except that he was born in slavery and was between fifty and fifty-six years old, the question of his age being for the jury.

SAME—JUDICIAL NOTICE—PLAINTIFF'S ACCEPTABILITY FOR INSURANCE. Standard mortality tables are admissible in evidence to show plaintiff's life expectancy without proving that he was acceptable for insurance, inasmuch as judicial notice may be taken that the authoritative tables differ but slightly, and that many are not based upon insurance statistics.

SAME—INSTRUCTIONS—DETERMINING AMOUNT. In an action for personal injuries, an instruction on the subject of damages does not authorize the jury to go outside the evidence, in that they were told to consider all the evidence in the case and all the facts and circumstances and use their own judgment in arriving at the amount that would in their opinion adequately compensate the plaintiff.

MUNICIPAL CORPORATIONS—NEGLIGENCE—STREETS—LAW OF ROAD— VIOLATION—INSTRUCTIONS. In an action against the driver of an automobile for coming up behind and running over a street sweeper while driving on the wrong side of the street in violation of a city ordinance, it is proper to refuse to instruct the jury that obstructions on the other side of the street would warrant defendant in passing over to the wrong side, since defendant would be liable if he struck the plaintiff.

TRIAL—INSTRUCTIONS—EVIDENCE TO AUTHORIZE. Instructions upon a theory as to an accident are properly refused if there was no evidence to sustain such theory.

[1]Reported in 96 Pac. 4.

° APPEAL AND ERROR—REVIEW—VERDICTS—REFUSAL OF NEW TRIAL. The opinion of the trial judge that he would have decided on the evidence contrary to the verdict of a jury does not show that the verdict should be set aside, where the judge stated that he would not hesitate to set it aside if he were at all certain that it was unjust, and that to do so would usurp the province of the jury.

.    Appeal from a judgment of the superior court for Pierce county, Reid, J., entered November 7, 1907, upon the verdict of a jury rendered in favor of the plaintiff, after a trial on the merits in an action for personal injuries.    Affirmed.

*E. R. York* and *T. W. Hammond*, for appellant.

*Ellis, Fletcher & Evans* and *Boyle, Warburton, Quick & Brockway*, for respondent.

RUDKIN, J.—On the morning of June 18, 1906, the plaintiff and another employee of the city of Tacoma were engaged in sweeping Pacific Avenue, one of the public streets of that city.    It is customary for men thus employed to do their work facing the direction from which teams and vehicles are required to come, and in accordance with this custom the plaintiff, who was sweeping the east side of the avenue, worked with his face to the south, while his companion on the opposite side of the street worked with his face to the north. As the plaintiff was thus engaged in the discharge of his duties, an automobile driven by the defendant struck him in the back, causing permanent injuries for which a recovery was sought in this action.    From a judgment in favor of the plaintiff, this appeal is prosecuted.

The first error assigned is the admission in evidence of an ordinance of the city of Tacoma regulating traffic on the public streets, approved September 6, 1906.    Section 1, of this Ordinance provides that,

"On all streets running north and south, or northerly and southerly [such is Pacific Avenue] vehicles driven south or southerly shall be kept to the west or westerly side of the center of such streets, and vehicles going in the opposite direc-

tion on such streets shall be kept to the east or easterly side of such streets."

The objection to the ordinance was that it was repealed by a later ordinance, regulating the use and rate of speed of automobiles, approved June 12, 1907. The later ordinance has no repealing clause, but it is contended that the following provision contained therein works a repeal of the earlier ordinance by implication.

"The driver or operator of any automobile or motor vehicle shall be governed by the commonly accepted rules of road traffic, by turning to the right when meeting vehicles or teams or persons moving or heading in the direction opposite to that in which he is moving, and by turning to the left-hand side in passing vehicles or teams or persons moving or heading in the same direction in which he is moving, and shall cause such automobile or vehicle to be moved in a careful manner so as not to endanger or inconvenience any person."

Repeals by implication are not favored in law, and it can be seen at a glance that there is no necessary conflict between the provisions of the two ordinances. A provision requiring a driver to pass another in a given manner, is not in conflict with an additional requirement that he shall keep on a certain side of the street while going in a given direction.

The admission of mortality tables in evidence is the next error assigned. The ground of the objection was that the age of the respondent was not shown, that such tables are based on the lives of men acceptable for insurance, not on the lives of mankind in general, and that such tables have no application to negroes. The testimony showed that the respondent was a negro, born in slavery, and that he had no very definite knowledge as to his age, except that he was between fifty and fifty-six years old. Mortality tables covering the expectancy of life between the ages of fifty-four and sixty were offered in evidence, and it was for the jury to determine the age of the respondent and the year of the tables

that should apply. The record does not disclose the partic-
ular tables received in evidence, so that we cannot say that
they were based on the lives of those acceptable for insurance
only. We know that the Carlyle Tables, the Northampton
Tables and others are based on the entire population of given
localities for a given period, and we know that many others
are constructed from statistics based on the experience of one
or more insurance companies. For this reason we are unable
to say that the tables offered in evidence belong to the one
class or the other, but we prefer to rest our decision on
broader grounds. We are at liberty to take judicial notice of
the standard mortality tables, and a reference to them will
show that the expectancy of life under the different tables at
any given age does not differ widely. Thus, if we assume that
the respondent was fifty-six years of age at the time of re-
ceiving the injury, his life expectancy under the Carlyle
Tables is 16.89 years; under the American expectancy 16.72
years; under the Northampton tables 15.10 years; under
Dr. Wiggleworth's tables 17.78, and under the tables offered
by the respondent 16.7. All of these tables, with the possible
exception of those offered by the respondent—and of those
we have no knowledge—have been recognized as authoritative
by the courts and received in evidence. While there is some
difference in these different tables, yet an equal or even
greater difference in the expectancy of life may arise from
other causes. We know that mortality among males is
greater than among females; we know that, as we proceed
from the temperate to the torrid zone, mortality increases as
we go south; that heat stimulates the vital functions so that
maturity is reached earlier and decay commences earlier;
we know that food, air, raiment, and environment are impor-
tant factors in prolonging and shortening life. But notwith-
standing these differences, the practice of admitting standard
mortality tables in evidence whenever it becomes necessary to
estimate the value of annuities, dower, curtesy, or damages

for wrongful act, has become too well established to admit of question, and the application of the rule governing their admission does not depend on race or color, time or place. Of course the tables are not binding on the jury. As said by the court in *Vicksburg etc. R. Co. v. Putnam*, 118 U. S. 545, 7 Sup. Ct. 1, 30 L. Ed. 257:

"In order to assist the jury in making such an estimate, standard life and annuity tables, showing at any age the probable duration of life, and the present value of a life annuity, are competent evidence. . . . But it has never been held that the rules to be derived from such tables or computations must be the absolute guides of the judgment and conscience of the jury. On the contrary, in the important and much considered case of *Phillips v. London & S. W. Ry.*, above cited, the judges strongly approved the usual practice of instructing the jury in general terms to award a fair and reasonable compensation, taking into consideration what the plaintiff's income would probably have been, how long it would have lasted, and all the contingencies to which it was liable; and as strongly deprecated undertaking to bind them by precise mathematical rules in deciding a question involving so many contingencies incapable of exact estimate or proof."

On the question of damages the court instructed the jury that they should take into consideration all the evidence in the case and all the facts and circumstances, and use their own good judgment in arriving at the amount which in their opinion would adequately compensate the respondent for his injury. It is claimed that the court by this instruction authorized the jury to go outside the evidence, and act upon their own independent judgment in assessing damages, but the instruction taken as a whole admits of no such construction.

The refusal of the court to instruct the jury that the presence of obstructions in the street would warrant the appellant in passing from the side on which he was required to travel to the opposite side is assigned as error. There was no error

in the refusal of this instruction under the facts in this case. The issue was, did the appellant strike the respondent? If he did not, there was no cause of action. If he did, there was no defense, except as to the amount of the recovery. The appellant further requested the court to instruct the jury that if the respondent was struck by a dog and thrown in contact with the appellant's machine there could be no recovery. There was no evidence to sustain any such theory of the case, and the instruction was properly refused.

It is lastly contended that the evidence is not sufficient to sustain the verdict, and that the trial court expressed such disapproval of the verdict that it should have awarded a new trial. There was ample testimony on the part of the respondent to sustain the verdict, and all inquiry must end there so far as this court is concerned. While the trial judge did say, in passing on the motion for a new trial, that if the case had been tried before him without a jury he would have given judgment for the defendant, yet he added:

"This case is one in which each juror was as competent to arrive at a just conclusion, and understand and weigh the evidence, as was the court. If I felt at all certain that the verdict was unjust I would not hesitate to set it aside, but I have no such convictions. To set aside a verdict under such circumstances would be to usurp the province of the jury."

It requires no argument to show that the views of the learned trial judge were correct, and we will not pass on the motion to strike his opinion from the transcript. Finding no error in the record, the judgment is affirmed.

HADLEY, C. J., FULLERTON, ROOT, and MOUNT, JJ., concur.

DUNBAR and CROW, JJ., took no part.